**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BONNIE CARTER, | ) | Civil Action No. |
| | ) | |
| *Plaintiff,* | ) | Filed Electronically |
| | ) | |
| vs. | ) | |
| | ) | |
| K&L GATES LLP, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**COMPLAINT IN CIVIL ACTION**

Plaintiff, Bonnie Carter, by and through the undersigned counsel, files the following

Complaint in Civil Action against Defendant, K&L Gates LLP, averring as follows:

**THE PARTIES**

1.      Plaintiff, Bonnie Carter ("Plaintiff"), is an adult individual who resides in Cranberry

Township, Allegheny County, Pennsylvania 16066.

2.      Defendant, K&L Gates LLP ("Defendant"), is a foreign limited liability general

partnership formed under the laws of the State of Delaware with a registered office and principal

place of business located at K&L Gates Center, 210 Sixth Avenue, Pittsburgh, Allegheny County,

Pennsylvania 15222. Defendant does business under the fictitious name "K&L Gates." The

Plaintiff reported to work on a regular basis at such location (the "Facility").

**JURISDICTION AND VENUE**

**A.      This Court Possesses Subject Matter Jurisdiction Pursuant to 28 U.S.C. § 1331.**

3.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1331 ("Federal Question Jurisdiction") as Plaintiff is advancing claims under the Americans with

Disabilities Act of 1990 and the Americans with Disabilities Act Amendments of 2008, 42 U.S.C. § 12101, *et seq*. (the "ADA").

**B.      The United States District Court for the Western District of Pennsylvania is the Appropriate Venue for this Matter Pursuant to 28 U.S.C. § 1391(b).**

4.      Venue is proper in the United States District Court for the Western District of Pennsylvania, Pittsburgh Division (hereinafter, the "Western District") as a substantial part of the events and omissions claims occurred within this judicial district. Therefore, venue is proper pursuant to 28 U.S.C. § 1391(b).

5.      Specifically, these events and omissions occurred within Allegheny County, Pennsylvania, which is one of the counties encompassed by the Western District.

6.      This matter is properly before the Pittsburgh Division of the Western District given the conduct complained of herein arose in Allegheny County, Pennsylvania, and conduct arising within Allegheny County is docketed within the Pittsburgh Division of the Western District pursuant to LCvR 3.

**C.      This Court May Exercise Personal Jurisdiction Over Defendant.**

7.      This Court may exercise personal jurisdiction over Defendant pursuant to 42 Pa. C.S. § 5301(a)(2), and this Court's exercise of jurisdiction comports with the Due Process Clause of the United States Constitution.

8.      Personal jurisdiction is proper over a defendant if the defendant is a registered Pennsylvania entity and has thus "consented" to the exercise of general personal jurisdiction pursuant to 42 Pa. C.S. § 5301. *Aetna Inc. v. Kurtzman Carson Consultants, LLC*, No. 18-470, 2019 BL 114021, at *5 (E.D. Pa. Mar. 29, 2019) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Bane v. Netlink, Inc.*, 925 F.2d 637, 641 (3d Cir. 1991)).

9.      42 Pa. C.S. § 5301 states: "The existence of any of the following relationships

between a person and this Commonwealth shall constitute a sufficient basis of jurisdiction to enable the tribunals of this Commonwealth to exercise general personal jurisdiction over such person."  42 Pa. C.S. § 5301(a). This definition is expanded to "corporations" pursuant to 42 Pa. C.S. § 5301(a)(2) which provides:

> Corporations.—
> (i) Incorporation under or qualification as a foreign corporation under the laws of this Commonwealth.
> (ii) Consent, to the extent authorized by the consent.
> (iii) The carrying on of a continuous and systematic part of its general business within this Commonwealth. 42 Pa. C.S. § 5301(a).

10.    As discussed above, Defendant has registered itself as a foreign limited liability general partnership in the Commonwealth of Pennsylvania and thereby subjected itself to the general jurisdiction of Pennsylvania's tribunals; further, Defendant maintains the Facility in Pennsylvania and conducts business operations within Pennsylvania. Accordingly, Defendant may properly be personally brought before this Court pursuant to 42 Pa. C.S. § 5301(a)(2).

**D.    Plaintiff Has Exhausted Her Administrative Remedies; Her Claims are Properly Before This Court.**

11.    Plaintiff has satisfied all procedural and administrative prerequisites under 42 U.S.C. § 2000e-5 and may now proceed to bring this action before the Court. Specifically:

a.    On or about December 18, 2025, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") seeking redress for her claims at charge number 533-2026-00727.

b.    On January 6, 2026, the EEOC issued the Notice of Right to Sue ("RTS Notice"), affording Plaintiff 90 days within which to timely file.

c.    The instant complaint is filed within the 90-day time period.

## FACTUAL BACKGROUND

3

**Employment History and Performance**

12.    Plaintiff began her employment with Defendant on or about March 2023 in the role of Manager of Endpoint Engineering in Defendant's Information Technology (IT) division (the "Position").

13.    In the Position, Plaintiff supervised IT engineers and handled complex technical issues across Defendant's global offices.

14.    Plaintiff was compensated on a salary basis at the annual rate of $185,000.

15.    Plaintiff reported to IT Director, Kurt Johnson ("Johnson").

16.    Throughout her tenure at Defendant, Plaintiff's performance was exemplary.

17.    Plaintiff received positive annual performance reviews in December 2023 and December 2024 directly from Johnson and others for whom Plaintiff performed work.

18.    Neither review nor any other informal feedback contained any negative feedback or areas of concern identified by Johnson.

19.    Plaintiff routinely worked 50-plus hours per week in furtherance of her duties and maintained a full workload.

**Hostile Work Environment Develops**

20.    In or around August 2023, Harpreet Suri ("Suri") joined Defendant as Chief Information Officer.

21.    Suri worked out of Defendant's office in Washington, D.C., and she managed all of IT globally, including Johnson and Plaintiff's department.

22.    Within the first couple of months, Suri created a toxic and hostile work environment.

23.    In September 2023, Plaintiff attended a meeting with Suri, where Suri stated that

"everyone she has encountered in the IT department is generally lazy and gets paid too much."

24. This aggressive statement set the tone for Suri's management style and shocked Plaintiff and her colleagues, including Johnson.

25. During 2024, Suri's aggressive and hostile conduct toward IT staff intensified.

26. Suri would routinely "yell and scream" at members of the IT staff while criticizing their work, making threats aimed at their job security, and generally treating the group, including Plaintiff, in an unprofessional manner.

27. By way of example, in May 2024, Plaintiff's team had been given approximately four days to complete an "iManage" document system upgrade.

28. Plaintiff and her team had to complete what amounted to about 100 hours of coding work in an expedited manner.

29. This caused the team to work long hours, including overnight, to address the last-minute demands.

30. During this intense time, Suri conducted a project call where she berated Plaintiff and her team for causing the rush job by poor planning.

31. The tone was overly aggressive and threatening.

32. Following this incident, Plaintiff was so distraught that she began crying, reporting this feeling to IT Director Johnson, who apologized to her.

## **Development of Medical Conditions**

33. As a direct result of the toxic work environment created by Suri and the mounting stress, Plaintiff began experiencing severe medical issues in early 2025.

34. Plaintiff developed generalized anxiety disorder and irritable bowel syndrome (IBS) (the "Disabilities").

35.     The Disabilities manifested in physical symptoms including vomiting in the mornings, inability to sleep at night, and severe stomach pain.

36.     Between January 2025 and September 2025, Plaintiff, on no fewer than four separate occasions, spoke with Johnson about these medical issues and explicitly explained to him that the work environment was causing the issues.

37.     Plaintiff made clear to Johnson that the stress level was becoming unbearable.

38.     Johnson listened but offered no meaningful assistance.

39.     Despite such discussion, the work environment did not change.

40.     Plaintiff also confided in her manager colleagues, including Gary Cooper ("Cooper"), Darrowed Wells ("Wells"), and Ray Florillo ("Florillo"), as well as team members Dave Bone ("Bone") and Curtis Watts ("Watts"), about the work-related stress and anxiety she was experiencing.

**Medical Leave**

41.     On September 10, 2025, Plaintiff consulted with her primary care physician regarding her severe anxiety.

42.     The physician advised Plaintiff that she needed to reduce her stress levels immediately.

43.     At a minimum, the physician mandated that Plaintiff take a medical leave of absence for a few weeks from the Position.

44.     On the same day, September 10, 2025, Plaintiff contacted Defendant's third-party leave administrator and applied for and was granted short-term disability leave.

45.     Plaintiff then notified Johnson via text message that she was not feeling well and would be going on a short-term disability leave from September 10, 2025, through October 6,

6

2025.

46. During Plaintiff's leave, she had no contact from Johnson or Suri.

47. However, Plaintiff spoke with her manager colleagues, Cooper, Wells, and Florillo, and team members Bone and Watts, and told them she was taking the leave to deal with her severe anxiety issues.

**Discriminatory Treatment Upon Return**

48. On October 6, 2025, Plaintiff returned to work following her approved medical leave.

49. Upon her return, Johnson's treatment of Plaintiff was dramatically and immediately different.

50. Upon return Johnson treated Plaintiff unlike he had before her short-term disability leave.

51. On one instance, Johnson called Plaintiff aside and directed she only focus on two projects - a Java software licensing removal project and a Windows 11 upgrade project.

52. This directive effectively stripped Plaintiff of approximately 85% of her job responsibilities.

53. Prior to short-term disability leave, Johnson, nor anyone with Defendant, had restricted or removed these many job duties.

54. The instruction was impersonal and cold, a stark departure from Johnson's prior management style.

55. The different treatment did not stop there, and on October 31, 2025, Johnson informed Plaintiff that he was canceling her attendance at a professional conference.

56. Plaintiff had planned to attend the conference scheduled for November 17, 2025,

well in advance of her short-term disability leave.

57.    After leave, Defendant, through Johnson, indicated Plaintiff would not be attending and offered no reasonable explanation, merely citing budget constraints as per why Plaintiff would not be attending despite having been registered to attend the training for at least six (6) months.

### Termination

58.    Within a week of the above, on or about November 7, 2025, Johnson sent Plaintiff a Microsoft Teams invitation directing her to join a meeting.

59.    Plaintiff joined the Teams call, where Johnson and Linda Ferraro ("Ferraro"), a Human Resources representative of Defendant, were present.

60.    Johnson did not speak, but Ferraro informed Plaintiff that "Your position has been eliminated," and "You're going to get four weeks' severance."

61.    Ferraro asked if Plaintiff had any questions.

62.    Plaintiff at that time was too emotionally distraught and crying to inquire as per why her position was eliminated.

63.    Johnson said nothing during the termination meeting.

64.    The termination was clearly wrongful and based upon disability discrimination.

65.    Defendant, through Suri and Johnson, created a discriminatory and hostile work environment that directly caused Plaintiff's medical conditions to develop and worsen.

66.    After Plaintiff took medical leave to address the very health conditions that Defendant's toxic environment had caused, she was systematically stripped of her job duties upon her return and then terminated within one month.

67.    The pretextual reason given for termination - "position elimination" - is transparently false, as Plaintiff had a full workload prior to her September 10, 2025, departure, was

8

registered to attend a training conference on behalf of Defendant, and routinely worked 50-plus hours per week in furtherance of her duties.

68.     The same duties, tasks, and obligations of Plaintiff's position were present upon Plaintiff's return following short-term leave, they were merely taken from Plaintiff or reassigned directly following her short-term disability leave.

**COUNT I**
**DISCRIMINATION IN VIOLATION OF**
**THE ADA**
**42 U.S.C. § 12101, *et seq.***

69.     Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

70.     The ADA was enacted in 1990 in an effort to provide a national mandate designed to eliminate discrimination against qualified individuals living with disabilities. 42 U.S.C. § 12101.

71.     Subsequently, Congress enacted the ADA Amendments Act of 2008 ("ADAAA"), effective January 1, 2009, which was designed to broaden the definitions of disability and "to reject the standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), and *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999)." 42 U.S.C. § 12101(b)(3)-(4).

72.     The ADAAA mandated that the definition of disability "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A).

73.     The ADA defines the term "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1).

74.     The ADA further defines the term "major life activities" to include, in pertinent part, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

75.     The definition of "major life activities" also includes "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B).

76.     Under the ADAAA, an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active. 42 U.S.C. § 12102(4)(D).

77.     Further, the determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as medication, medical supplies, equipment, or appliances. 42 U.S.C. § 12102(4)(E)(i).

78.     As averred hereinabove, Plaintiff's generalized anxiety disorder and irritable bowel syndrome (the "Disabilities") cause Plaintiff to experience vomiting in the mornings, inability to sleep at night, severe stomach pain, and other medical maladies.

79.     Accordingly, these symptoms qualify as "major life activities" pursuant to 42 U.S.C. § 12102(2), and Plaintiff therefore possesses a "disability" pursuant to 42 U.S.C. § 12102(1)(A).

80.     To establish a *prima facie* case of discrimination under the ADA, a Plaintiff must demonstrate: (1) they are a disabled person within the meaning of the ADA; (2) they are otherwise qualified to perform the essential functions of their job, with or without reasonable accommodations by the employer; and (3) they suffered an otherwise adverse employment

decision as a result of discrimination. *Gaul v. Lucent Techs*, 134, F.3d 576, 580 (3d Cir. 1998)

**A.      Plaintiff is a "Disabled Person" Pursuant to 42 U.S.C. § 12102 of the ADA.**

81.      As averred hereinabove, Plaintiff possessed a "disability" under the meaning of the ADA and was correspondingly "disabled" for purposes of establishing her *prima facie* case, given the numerous ways in which the Disabilities substantially impaired her major life activities.

82.      Specifically, Plaintiff's anxiety disorder substantially limited her ability to sleep, concentrate, think, and work.

83.      Plaintiff's anxiety caused her to experience inability to sleep at night, vomiting in the mornings, and severe physical and emotional distress.

84.      Aside from anxiety disorder, Plaintiff also has irritable bowel syndrome.

85.      Plaintiff's irritable bowel syndrome substantially limited her digestive and bowel functions, causing severe stomach pain and vomiting.

86.      Anxiety disorder and irritable bowel syndrome, individually and collectively, these disabilities substantially limited Plaintiff's major life activities of sleeping, working, and the operation of major bodily functions, including, but not limited to Plaintiff's digestive, bowel, and neurological functions.

87.      Further, the Disabilities are episodic conditions that substantially limit major life activities when active and therefore constitute disabilities under 42 U.S.C. § 12102(4)(D).

88.      Between January 2025 and September 2025, Plaintiff informed Johnson on no fewer than four separate occasions that the work environment was causing her medical issues, thereby establishing Defendant's knowledge of the Disabilities.

89.      Plaintiff's primary care physician mandated a medical leave of absence on September 10, 2025, due to the severity of the Disabilities and the need to reduce stress levels immediately as a plan of threatening her worsening conditions.

90. Plaintiff, communicating same to Defendant, applied for and was granted short-term disability leave from September 10, 2025, through October 6, 2025.

91. Accordingly, Plaintiff possessed a disability under the actual disability prong of 42 U.S.C. § 12102(1)(A).

92. In the alternative, Plaintiff possessed a disability under the "regarded as" prong of 42 U.S.C. § 12102(1)(C), as Defendant treated Plaintiff as having an impairment when it took adverse employment actions against her immediately upon her return from medical leave.

**B. Plaintiff is a Qualified Individual Pursuant to 42 U.S.C. § 12111 of the ADA and Was Qualified to Perform the Essential Duties of Her Job.**

93. The ADA provides that a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

94. To meet this definition, Plaintiff must show she possessed "the requisite skill, experience, education and other job-related requirements of the employment position" and that she "can perform the essential functions of the position with or without reasonable accommodations." *Id.*

95. Plaintiff possessed and exercised the skill, experience, and ability needed to perform the essential functions of her role as Manager of Endpoint Engineering.

96. Specifically, Plaintiff was sufficiently skilled in the areas of supervising IT engineers and handling complex technical issues across Defendant's global offices.

97. Plaintiff performed the position afore-described over a period of years for Defendant, making it self-evident she was qualified for her position as she was appropriately possessing the skill, experience, education and any other requirements to fulfill the role in which Defendant placed her.

12

98.    Plaintiff received positive annual performance reviews in December 2023 and December 2024 directly from Johnson and others for whom Plaintiff performed work.

99.    Plaintiff did not receive a negative review nor any other negative informal feedback or areas of concern identified by Johnson, or any other superior.

100.    At all times material, Plaintiff was qualified to perform the essential duties of her position.

**C.    Plaintiff Suffered Adverse Employment Actions Because of Her Disability.**

101.    The Third Circuit has held that an "adverse employment action" is an action taken by an employer which is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Storey v. Burns Int'l Servs*., 390 F.3d 760, 764 (3d Cir. 2004).

102.    Plaintiff suffered multiple adverse employment actions as a direct result of her Disabilities.

103.    Upon Plaintiff's return to work on October 6, 2025, following her approved medical leave for her Disabilities, Johnson's treatment of Plaintiff was dramatically and immediately different.

104.    Instead of welcoming her back or inquiring about her health, Johnson called Plaintiff aside and informed her she would have a lessor role than prior to her short-term leave, focusing solely on a Java software licensing removal project and a Windows 11 upgrade project.

105.    This directive by Defendant effectively stripped Plaintiff of approximately 85% of her job responsibilities, responsibilities Plaintiff had held and fulfilled for years for Defendant.

106.    The instruction was impersonal and cold, a stark departure from Johnson's prior management style.

107.    The timing of this adverse action - immediately upon Plaintiff's return from

13

medical leave for her Disabilities - establishes a direct causal connection between the Disabilities and the adverse employment action.

108.   In addition to the foregoing, on or about October 31, 2025, Johnson informed Plaintiff that he was canceling her attendance at a professional conference scheduled for November 17, 2025, citing budget constraints.

109.   Plaintiff had been registered for this training for six months, well before her leave.

110.   This cancellation constituted a further adverse employment action that altered Plaintiff's terms, conditions, and privileges of employment by denying her access to professional development opportunities, something she had planned to attend well in advance.

111.   Also, on November 7, 2025, Defendant terminated Plaintiff's employment.

112.   The termination occurred only one month after Plaintiff's return from medical leave for the Disabilities, significantly reducing Plaintiff's work duties, and cancelling her attendance at a professional conference.

113.   The temporal proximity between Plaintiff's protected medical leave, a reduction in duties, removal from conference attendance and her termination establishes a direct causal connection between the Disabilities and the ultimate adverse employment action of termination.

114.   All these actions occurred after Plaintiff notified Johnson of her Disabilities and medical condition, as well as after returning from short-term disability leave which was approved by Defendant.

115.   The pretextual reason given for termination - "position elimination" - is transparently false, as Plaintiff had a full workload prior to her September 10, 2025, departure and the same duties, obligations, and rigors of her 50-plus hours per week position were present following Plaintiff's return to work after leave.

**D.      Plaintiff is Entitled to Punitive Damages.**

116.     A Plaintiff may recover punitive damages when they can demonstrate a Defendant "engaged in discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

117.     The terms "malice" and "reckless indifference" pertain specifically to the Defendant's knowledge that it acted in violation of federal law rather than an awareness of engaging in "discrimination." *Kolstad v. ADA*, 527 U.S. 526, 535 (1999).

118.     At all times relevant herein, Defendant acted with the knowledge it was lawfully required to provide a workplace free of discrimination to individuals like Plaintiff who were statutorily protected by the ADA.

119.     Defendant acted with reckless indifference to Plaintiff's federally protected rights when, despite having actual knowledge of the Disabilities through Plaintiff's repeated complaints and approved medical leave, it immediately stripped her of approximately 85% of her job responsibilities upon her return from medical leave, cancelled her attendance of a long scheduled professional conference, and ultimately, terminated her employment within one month.

120.     As a direct and proximate result of Defendant's discriminatory conduct in violation of the ADA, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, Bonnie Carter, seeks a judgment against Defendant, K&L Gates LLP, for willful noncompliance with the ADA and seeks: (i) compensatory damages,

15

including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) punitive damages in an amount to be determined at trial and in an amount sufficient to deter Defendant from engaging in future conduct of a similar nature; (iii) equitable relief in the forms of back pay and front pay; (iv) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff pursuant to 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e-5(k)); (v) pre-judgment and continuing interest; and (vi) any further legal and equitable relief as this Court may deem just and proper.

## COUNT II
## RETALIATION IN VIOLATION OF THE ADA
### 42 U.S.C. § 12101, *et seq.*

121.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

122.    The ADA contains a broad anti-retaliation provision that prohibits discrimination against individuals who oppose any act or practice made unlawful by the ADA or who participate in ADA proceedings. 42 U.S.C. § 12203.

123.    Specifically, 42 U.S.C. § 12203(a) provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."

124.    The anti-retaliation provision protects individuals who engage in "protected activity," which includes opposing discriminatory practices, requesting reasonable accommodations, taking disability-related medical leave, and reporting that work conditions are causing disability-related medical issues.

16

125.    To establish a prima facie case of retaliation under the ADA, a plaintiff must demonstrate: (1) engagement in protected activity; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse action. See: *Kengerski v. Allegheny Cty.*, 435 F. Supp. 3d 671, 676 (W.D. Pa. 2020).

126.    Once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action.

127.    The plaintiff may then demonstrate that the employer's stated reason is pretextual.

## A.    Plaintiff Engaged in Protected Activity.

128.    Protected activity under the ADA includes taking disability-related medical leave, and reporting to an employer that work conditions are causing disability-related medical issues.

129.    Plaintiff engaged in protected activity on multiple occasions throughout her employment with Defendant.

130.    Between January 2025 and September 2025, Plaintiff, on no fewer than four separate occasions, spoke with Johnson about her disabilities and the medical issues she was facing as the disabilities were agitated and explicitly explained to him that the work environment was causing the issues.

131.    Plaintiff made clear to Johnson that the stress level created by Suri's hostile management style was becoming unbearable and was directly causing her disabilities to rise to life threatening medical conditions, causing them to become unmanageable, and drastically affecting her health.

132.    These complaints to Johnson constituted protected activity under the ADA, as Plaintiff was opposing discriminatory practices and reporting that work conditions were causing disability-related medical issues.

133.    On or about September 10, 2025, Plaintiff consulted with her primary care

17

physician regarding her severe anxiety, and the physician mandated that Plaintiff take a medical leave of absence for a few weeks from the Position.

134. On the same day, September 10, 2025, Plaintiff contacted Defendant's third-party leave administrator and applied for and was granted, by Defendant, short-term disability leave from September 10, 2025, through October 6, 2025.

135. Plaintiff's actions as afore-described constituted protected activity under the ADA for her Disabilities.

**B.    Plaintiff Suffered Adverse Employment Actions.**

136. An adverse employment action is an action taken by an employer which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment. *Storey v. Burns Int'l Servs.*, 390 F.3d 760, 764 (3d Cir. 2004).

137. Plaintiff suffered multiple adverse employment actions following her engagement in protected activity as averred herein.

138. Johnson's treatment of Plaintiff was dramatically and immediately different when she returned from short-term disability leave versus prior to said leave.

139. Johnson spoke to and interacted with Plaintiff unlike he ever had before.

140. Johnson also drastically changed the work Plaintiff performed, assigning her only two projects: a Java software licensing removal project and a Windows 11 upgrade project.

141. This directive effectively stripped Plaintiff of approximately 85% of her job responsibilities, constituting a material adverse employment action that altered the terms and conditions of her employment.

142. In addition, on October 31, 2025, Johnson informed Plaintiff that he was canceling her attendance at a professional conference scheduled for November 17, 2025, citing budget constraints.

143.     Plaintiff had been registered for this training for six months, and the cancellation constituted further adverse employment action that denied her access to professional development opportunities.

144.     Within a week of cancelling this conference, on November 7, 2025, Defendant terminated Plaintiff's employment.

**C.     Causal Connection Between Protected Activity and Adverse Actions.**

145.     Temporal proximity between protected activity and adverse employment action can establish the requisite causal connection for a retaliation claim. See: *Cooper v. Fayette Cty.*, No. 2:24-CV-01213-MJH, 2025 U.S. Dist. LEXIS 200959, at *10 (W.D. Pa. Oct. 10, 2025).

146.     Here, the temporal proximity between Plaintiff's protected activity and the adverse employment actions is extraordinarily close and establishes a direct causal connection.

147.     The first adverse actions - the stripping of approximately 85% of Plaintiff's job responsibilities and different treatment from her manager - occurred on October 6, 2025, the very day Plaintiff returned from her protected medical leave.

148.     The second adverse action - the cancellation of Plaintiff's professional conference attendance - occurred on October 31, 2025, only 25 days after Plaintiff's return from protected medical leave.

149.     The third and ultimate adverse action - Plaintiff's termination - occurred on November 7, 2025, only 32 days after Plaintiff's return from protected medical leave.

150.     All three adverse employment actions occurred around one month after Plaintiff's return from the protected medical leave she took to address her Disabilities.

151.     The immediate and successive nature of these adverse actions, following closely on the heels of Plaintiff's protected activity, establishes the causal connection required for a retaliation claim.

19

152.     Moreover, Defendant's stated reason for termination - "position elimination" - is transparently pretextual, as Plaintiff had a full workload prior to her September 10, 2025 departure and routinely worked 50-plus hours per week in furtherance of her duties, and those tasks, timelines, and duties that required such time remained after her return from leave, but were merely taken from her.

**D.     Plaintiff is Entitled to Damages.**

153.     As a direct and proximate result of Defendant's retaliatory conduct in violation of the ADA, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

154.     Plaintiff is further entitled to reinstatement to her position or, in the alternative, front pay if reinstatement is not feasible.

155.     Plaintiff is entitled to reasonable attorney's fees and costs pursuant to 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e-5(k)).

156.     42 U.S.C. § 1981a provides for compensatory damages for violations of the ADA, including damages for emotional distress and other non-pecuniary losses.

WHEREFORE, Plaintiff, Bonnie Carter, seeks a judgment against Defendant, K&L Gates LLP, for willful noncompliance with the ADA and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) equitable relief in the forms of back pay, front pay, and reinstatement; (iii) the costs of instituting this action together

with reasonable attorney's fees incurred by Plaintiff pursuant to 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e-5(k)); (iv) pre-judgment and continuing interest; and (v) any further legal and equitable relief as this Court may deem just and proper.

**COUNT III**
**HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE ADA**
**42 U.S.C. § 12101, *et seq.***

157.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

158.    To establish a hostile work environment claim under the ADA, an employee must demonstrate "(1) [she] is a qualified individual with a disability under the ADA; (2) [she] was subject to unwelcome harassment; (3) the harassment was based on [her] disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and to create an abusive working environment; and (5) that [her employer] knew or should have known of the harassment and failed to take prompt effective remedial action. See: *Hatch v. Franklin Cnty.*, 755 F. App'x 194, 201-02 (3d Cir. 2018) (citations omitted); *see also Woods v. AstraZeneca Pharms., L.P.*, 659 F. Supp. 3d 512, 544 (M.D. Pa. 2023) (citing *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667 (3d Cir. 1999)).

159.    The Third Circuit has noted that severe or pervasive is the correct standard under which to apply a totality of the circumstances approach in examining "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

**A.      Plaintiff is a qualified individual with a disability under the ADA**

160.    As averred hereinabove, Plaintiff possessed two "disabilities" under the meaning

21

of the ADA for purposes of establishing her *prima facie* case.

161.    Plaintiff's anxiety disorder limited major life activities, of but not limited to her ability to sleep, concentrate, think and work.

162.    Plaintiff's irritable bowel syndrome substantially limited her digestive and bowel functions, causing sever stomach pain and vomiting.

163.    As such, Plaintiff is a qualified individual with a disability per the ADA.

**B.    Plaintiff was subject to unwelcome harassment because of her disabilities.**

164.    As stated above, throughout the course of her employment following the aggravation of medical condition(s) caused by her Disabilities, Plaintiff was targeted with intentional discrimination by Suri and Johnson.

165.    Specifically, Suri and Johnson subjected Plaintiff to a heightened level of scrutiny, unreasonable work demands, dismissive treatment, and hostile conduct because of her Disabilities.

166.    Between January 2025 and September 2025, Plaintiff, on no fewer than four separate occasions, spoke with Johnson about her medical issues and explicitly explained to him that the work environment was causing the issues.

167.    Plaintiff made clear to Johnson that the stress level was becoming unbearable and was directly affecting her health, and Defendant did nothing to change the work environment.

168.    If anything, Johnson's response was dismissive of Plaintiff's reports that the hostile work environment was causing and exacerbating her Disabilities.

169.    Indeed, Defendant's conduct was reasonably calculated to exacerbate the Disabilities and force Plaintiff to resign or be terminated.

170.    Therefore, Plaintiff was intentionally targeted with hostile comments, unreasonable demands, dismissive treatment, and a heightened level of scrutiny because of the

Disabilities.

171.    Further, after Plaintiff was forced to take a medical leave, as averred throughout, Plaintiff was treated differently by management, had an approximate 85% reduction in her work duties, had her ability to attend a professional conference revoked whereas similarly situated co-workers did not have the same treatment, and ultimately Plaintiff was fired.

**C.    Plaintiff was harassed based on her disabilities and because she requested medical leave.**

172.    As averred herein, as Plaintiff's disabilities and health worsened due to her work environment, so did the treatment she received at the hands of Defendant.

173.    After short-term leave, Plaintiff was treated different because of her disabilities outright by the comments of her superiors, by removing work from her, by revoking privileges, and by unreasonable expectations.

**D.    The Harassment Plaintiff Endured was Severe or Pervasive such that it Altered the Conditions of Her Employment and Created an Abusive Working Environment.**

174.    At all times relevant hereto, the discrimination Plaintiff experienced was both "severe" and "pervasive."

175.    Defendant's conduct, through Suri and Johnson, was at all times unwelcome by Plaintiff, interfered with the performance of her work duties, and persisted from August 2023 through Plaintiff's termination in November 2025.

176.    The frequency of hostile conduct was extraordinarily high, as Suri routinely yelled and screamed at Plaintiff and other IT staff members on an ongoing basis throughout 2024 and 2025.

177.    The severity of the hostile conduct was significant, as Suri's aggressive management style created an atmosphere of fear and intimidation, included threats aimed at job

security, and imposed unreasonable work demands that required Plaintiff and her team to work long hours and overnight shifts.

178. The hostile conduct was both physically and psychologically harmful to Plaintiff, as evidenced by the exacerbation of her Disabilities, including generalized anxiety disorder and irritable bowel syndrome.

179. Plaintiff's Disabilities manifested in severe physical symptoms including vomiting in the mornings, inability to sleep at night, and severe stomach pain.

180. The hostile conduct was so severe that Plaintiff had to seek medical treatment with her primary care physician.

181. The hostile conduct unreasonably interfered with Plaintiff's work performance and created such severe anxiety and stress that Plaintiff was forced to seek medical treatment and ultimately take a mandated medical leave of absence due to the severity and need to immediately reduce stress levels.

182. Plaintiff repeatedly requested that the hostile conduct cease, including by reporting to Johnson on no fewer than four separate occasions between January 2025 and September 2025 that the work environment was causing her medical issues.

183. Despite Plaintiff's repeated pleas for help, Defendant permitted Suri's conduct to continue unabated, and Johnson offered no meaningful assistance.

184. The hostile environment created by Suri and tolerated by Johnson pervaded Plaintiff's entire work environment and was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment and create an objectively abusive working environment.

**E.    Defendant knew or Should Have Known of the Harassment and Failed to Take Prompt Effective Remedial Action.**

185. Despite Plaintiff's attempts to deter Suri's conduct by reporting to Johnson on

multiple occasions, the conduct persisted.

186.   Plaintiff notified Defendant, via informing Johnson, of the environment and its impact upon her health.

187.   Defendant did not take any action to change the environment.

188.   The hostile work environment was so severe that Plaintiff was forced to take short-term disability leave from September 10, 2025, through October 6, 2025, to address the severe anxiety caused by the hostile work environment.

189.   Upon her return from medical leave on October 6, 2025, Plaintiff was immediately subjected to further adverse treatment, including the stripping of approximately 85% of her job responsibilities, the cancellation of her professional conference attendance, and ultimately her termination on November 7, 2025.

190.   As a direct and proximate cause of Suri's hostile conduct and Johnson's failure to address it, Plaintiff was forced to take medical leave and was ultimately terminated from employment with Defendant.

WHEREFORE, Plaintiff, Bonnie Carter, seeks a judgment against Defendant, K&L Gates LLP, for willful noncompliance with the ADA and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) punitive damages in an amount to be determined at trial and in an amount sufficient to deter Defendant from engaging in future conduct of a similar nature; (iii) equitable relief in the forms of back pay and front pay; (iv) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff pursuant to 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e-5(k)); (v) pre-judgment and continuing

interest; and (vi) any further legal and equitable relief as this Court may deem just and proper.

## JURY DEMAND

191. Plaintiff requests a trial by jury on all matters so triable.


Respectfully submitted,


**THE WORKERS' RIGHTS LAW GROUP, LLP**

Date:  April 6, 2026                    By: */s/ Andrew M. Snyder*
                                            Andrew M. Snyder, Esq. (Pa. I.D. No. 320004)
                                            */s/ Brendan K. Petrick*
                                            Brendan K. Petrick, Esq. (Pa. I.D. No. 88968)
                                            */s/ Patrick W. Carothers*
                                            Patrick W. Carothers, Esq. (Pa. I.D. No. 85721)

                                            The Workers' Rights Law Group, LLP
                                            Foster Plaza 10
                                            680 Andersen Drive, Suite 230
                                            Pittsburgh, PA 15220
                                            Telephone: 412.910.9592
                                            Facsimile: 412.910.7510
                                            andrew@workersrightslawgroup.com
                                            brendan@workersrightslawgroup.com
                                            patrick@workersrightslawgroup.com

                                            *Counsel for Plaintiff, Bonnie Carter*

26